GEORGE F. COLLINS, JR., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2871–65.   Filed June 30, 1966.

*Donald P. Moyers* and *William A. Goffe*, for the petitioner.
*J. C. Linge*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the calendar year 1959 in the amount of $220,046.20. The issues for decision are whether a transfer of appreciated stock in a family-held corporation by petitioner to his wife pursuant to an agreement incident to a divorce granted in Oklahoma was a nontaxable division of property or a taxable transfer and, if the latter, the fair market value of the stock on the date of transfer.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

George F. Collins, Jr., hereinafter referred to as petitioner, resides in Tulsa, Okla. He filed his individual Federal income tax return for the calendar year 1959 with the district director of internal revenue at Oklahoma City, Okla.

Petitioner married Beverley R. Lorton (hereinafter referred to as Beverley) of Atlanta, Ga., on July 2, 1942. Beverley, a widow, had a son, born in 1937 of her first marriage, whom petitioner adopted. Beverley possessed assets not in excess of $10,000 in value when she married petitioner. Three children were born of the marriage of petitioner and Beverley, all of whom were minors in 1959.

During his marriage, petitioner was the controlling shareholder, president, and chief executive officer of Liberty Glass Co. (hereinafter referred to as Liberty).

Beverley was not actively employed in petitioner's business enterprises during her marriage to petitioner, but she entertained business visitors frequently at home and attended conventions with her husband where she helped in the entertainment of customers and others with whom Liberty had business relationships. Some of these individuals were also personal friends and acquaintances of petitioner's and Beverley's. Beverley was interested in the success of her husband's business enterprises. She made every effort to conduct herself in such a

manner as to assist her husband in his business efforts. Petitioner often discussed his business activities with Beverley.

On April 20, 1959, petitioner and Beverley, having decided they could not continue their marriage relationship, entered into an agreement settling their property rights and providing for custody of the children and support and maintenance for Beverley and the children.

Before negotiations were begun concerning the property settlement, Beverley instructed her attorney that she desired as much monthly alimony as she could get and a million dollars in cash. Beverley's attorney proposed a settlement providing that petitioner pay alimony of $3,000 per month to Beverley for 240 months, pay $250 per month as support for each child until the child reached 21, and transfer to Beverley the following property:

33 percent of the outstanding common stock of Liberty,
$75,000 in municipal bonds and United States securities,
$50,000 in savings and loan accounts,
All insurance on Beverley's life,
Furniture, furnishings, jewelry, clothing and furs,
Country Club membership, and
Any two of three cars (or equivalent).

Under this proposal Beverley would agree to transfer to petitioner all insurance on petitioner's life, and her 10-percent stockholding in Red Ball, Inc., a corporation in which a trust for the children of petitioner and Beverley owned 88 percent of the stock and petitioner 2 percent. Certain other minor provisions were included in this proposal.

The proposal that petitioner transfer a 33-percent interest in Liberty to Beverley was coupled with a provision that she have the right to resell the stock to petitioner for $1,750,000. This proposal was not accepted by petitioner and negotiations between the attorneys for Beverley and petitioner continued for about a month.

After tentative agreement was reached between the attorneys for Beverley and petitioner, Beverley's attorney prepared a draft of an agreement. On April 20, 1959, the parties signed an agreement which provided in part as follows:

WHEREAS, it is the desire of both parties (subject to the contingency of court approval as set out below) to finally and for all times settle and determine their property rights, any right of support and maintenance of said Second Party by the First Party, together with all other rights existing between the parties growing out of their said marriage relation;

THEREFORE, the said parties hereto, for and in consideration of the mutual promises herein made, covenant and agree as follows:

1. The First Party [petitioner] will pay to the Second Party [Beverley] the sum of $110,000.00 in cash within 30 days from the date of this contract.

2. The First Party will pay to the Second Party as alimony the sum of $40,000.00 per year for ten years, and thereafter the sum of $35,000.00 per year

for ten years and thereafter the sum of $30,000.00 per year during the Second Party's lifetime; provided

\* \* \* \* \* \* \*

b) In the event of the remarriage of Second Party, all payments falling due thereafter shall be reduced to fifty per cent (50%) of the amount thereof; and

\* \* \* \* \* \* \*

3. First Party will transfer and deliver or cause to be transferred and delivered to the Second Party stock certificates evidencing the ownership of record on the books of the company in Second Party of 26,592 shares of the common capital stock of Liberty Glass Company, a corporation; and the First Party warrants \* \* \* that such shares equal 16.62% of the total outstanding common stock of Liberty Glass Company.

4 The First Party will transfer and deliver or cause to be transferred and delivered to the Second Party with full ownership thereof in the Second Party the following items of property:

a) All life insurance which the First Party owns on the Second Party's life.

b) A Proprietary or Associate Membership (or cash of $3,050.00 for purpose of buying such membership) in Southern Hills Country Club, \* \* \*

c) All furniture and furnishings and household items in the home at 2211 East 41st Street, except

\* \* \* \* \* \* \*

d) Any two of the present three automobiles \* \* \* now used by the family, or at First Party's election any one of such three cars plus a new station wagon automobile \* \* \*

5. All jewelry, clothing and furs worn or used by Second Party shall be retained by Second Party and shall be her sole, separate and individual property, free of all claims of First Party.

6. The Second Party will transfer and deliver or cause to be transferred and delivered to the First Party with full ownership thereof in the First Party the following items of property;

a) All life insurance which the Second Party owns on the First Party's life.

b) All common stock in Red Ball, Inc., a corporation, now owned of record by Second Party.

7. All property, real or personal (other than that herein specifically agreed to be given to First Party) standing or owned of record in the name of Second Party shall belong to Second Party absolutely as her sole, separate and individual property, free, clear and discharged of all claims of First Party.

8. All property, real or personal, standing or owned of record in the name of First Party (save and except only that property specifically agreed herein to be paid, conveyed or delivered to Second Party) shall belong absolutely to First Party as his sole, separate and individual property, free, clear and discharged of all claims of Second Party.

\* \* \* \* \* \* \*

11. Second Party, in consideration of the execution of this Agreement and of the conveyance and payments agreed to be made to her agrees to accept and does hereby accept the same in full, final and complete settlement of all the rights of Second Party of any and every character which she may have or might otherwise have in and to the property of the parties, and in full, final and complete settlement of all claims which she may now have against First Party arising from or incident to the marriage relation, including, but not limited to, claims for division of property, alimony, support or maintenance.

\* \* \* \* \* \* ●

13. An action for divorce is contemplated by Second Party and it is agreed by the parties hereto that this Agreement shall be submitted to the Judge of the District Court having jurisdiction of such action for his approval. It is further agreed that this Agreement is subject to and contingent upon approval by said Court. * * *

14. The parties hereto have four children, namely, Robert Lorton Collins (adult), George Fulton Collins, III (age 15), Beverley Rogers Collins, Jr. (age 13) and Roger Buckner Collins (age 6). In the event a divorce be granted to either party hereto, the parties hereto agree to recommend to the Court having jurisdiction the following with respect to the custody, care and support of said children:

\*      \*      \*      \*      \*      \*      \*

b) First Party shall pay to the Second Party the sum of $175.00 per month per minor child during each calendar month that the child spends at least 20 days living with her or at her home, commencing May 1, 1959, and terminating as to each child either when such child reaches age 21 or is married.

c) First Party shall pay all reasonable and necessary expenses of each child (including the son Robert for one semester) while away from home at any preparatory school or college or university * * *

d) First Party shall pay the tuition of the children Beverley and Roger while attending Holland Hall School in Tulsa, Oklahoma, or its successor.

e) First Party shall pay only such medical expenses of each child, until such child reaches the age of 21 years or is married, other than normal ordinary medical expenses.

Beverley filed a petition for divorce from petitioner in the District Court for Tulsa County, Okla., on April 21, 1959. This petition alleged in part:

That said defendant is possessed of large amounts of property which has been acquired by the parties jointly during their marriage but which property stands in the name of the defendant; that said defendant is also possessed of considerable property in his own right and that he has a substantial income from earnings each year.

WHEREFORE, plaintiff prays that she may be divorced from her said husband by reason of the fault of the said defendant as aforesaid; * * * that the Court make just and equitable division of the property acquired by the parties jointly during said marriage; that she be allowed alimony out of the property and earnings of the defendant in such amount as shall be equitable and just; and that said defendant be required to pay to her reasonable amounts for the support of their said children; * * *

Petitioner entered his general appearance and answer on April 28, 1959, in which he stated in part:

Said defendant further states that the Plaintiff and this defendant have entered into an Agreement for the division of property and payment of alimony, subject to the approval of this Court, in the event a divorce is granted, which Agreement this defendant requests the Court to approve and which Agreement will be submitted to the Court for approval at the time of the trial of this action.

The District Court entered a decree of divorce in favor of Beverley on April 28, 1959. The District Court found, among other things, that—

6. * * * at the time of the marriage, plaintiff [Beverley] was not possessed of any lands, tenements and hereditaments owned by her, and that defendant's

estate consisted largely of an inheritance of real, personal and mixed property, including but not being limited to a controlling interest in various business enterprises and corporations, most of which interests he still owns and of which he is now possessed; that the defendant always has provided liberally and abundantly for his wife and children in full keeping with his property and affairs, their station in life, and their prominent position in the community; that it is defendant's continuing wish and desire, even though the legitimate ends of matrimony can no longer be supported by and between the parties, that his family continue to enjoy the comforts, conveniences and advantages in life to which they have become accustomed, so far as defendant's property and affairs will reasonably permit, and as should prove equitable and just, having due regard:

a) To the long years the parties have been married;

b) That the marriage was one of love and affection and not one of convenience on the part of either party;

c) To the valuable contributions made by plaintiff to the marriage and to the success and growth of defendant's business enterprises and to defendant's happiness while the parties hereto were compatible.

7. Pursuant to the considerations aforesaid the parties hereto did, on the 20th day of April, 1959, enter into a written agreement, subject to the Court's approval, for the purpose of adjustment and settlement of all claims to alimony by the plaintiff whether allowed to her in real or personal property, or both, or as same might be decreed to her in money, payable either in gross or in installments, and as to such property, whether real or personal, as may have been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties and for the further purpose of setting the same apart to one of the parties, and requiring the other thereof to pay such sum as may be just and proper to effect a fair and just division thereof. The Court further finds that the plaintiff herein desires to accept the rights granted her in said Agreement in lieu of all claims of every kind or nature which she might have against defendant, including, but not being limited to, any rights she may have to alimony, maintenance, support or division of property and that she desires to accept the same in full and complete settlement of all statutory rights vested in her pursuant to Title 12, Section 1278 of the Oklahoma Statutes. The Court, upon examination of said Agreement and being otherwise well and sufficiently advised as to the property, affairs and rights of the parties to the marriage, finds that said Agreement is fair, reasonable and just and should be approved and that the said Agreement should neither be incorporated in, merged in, nor superseded by this decree but should remain in full force and effect hereafter.

The decree entered by the court was drafted and approved as to form by the attorneys for Beverley and petitioner, submitted to the court and entered by the court.

On May 1, 1959, petitioner and Beverley each made the transfers of property to the other called for in the agreement of April 20, 1959. The 26,592 shares of Liberty common stock transferred by petitioner to Beverley constituted 16.62 percent of the total outstanding stock of Liberty and had a basis in petitioner's hands of $19,815.19 on May 1, 1959.

Red Ball, Inc., 10 shares of the stock of which Beverley transferred to petitioner pursuant to the agreement of April 20, 1959, is an Oklahoma corporation engaged primarily in the trucking business. Its

principal business consists of hauling the products manufactured by Liberty. It was organized January 22, 1942, and all of its 100 shares of common stock ($100 par value) were originally owned by petitioner. In December 1944 Beverley acquired from petitioner 40 shares of Red Ball, Inc., for $4,000. Beverley had these funds at the time of her marriage to petitioner. In January 1946, Beverley transferred 30 of these shares to trusts for the benefit of her three children, Robert Lorton Collins, George Fulton Collins III, and Beverley Rogers Collins. At the same time, petitioner transferred 45 of his shares of Red Ball, Inc., to these same trusts. In December 1953, petitioner transferred 13 more shares of his Red Ball, Inc., stock to a trust for the benefit of the fourth child. The capital stock and surplus per books of Red Ball, Inc., aggregated $137,232 on December 31, 1958, and $146,447 on December 31, 1959.

In addition to owning stock of Liberty petitioner on April 20, 1959, owned other securities, real estate, oil and gas interests, and the stock of the Tulsa-Sapulpa Union Railroad Co.

Liberty is an Oklahoma corporation with its principal place of business located at Sapulpa, Okla., a town about 15 to 20 miles from Tulsa. Liberty is engaged in the business of manufacturing milk and soft-drink-beverage glass bottles, as well as some general-line glass bottles. Liberty produces some of its bottles for nationally known users, such as Coca-Cola, under license agreements.

Liberty was organized in 1918 by petitioner's father who died September 22, 1939. Petitioner has been active president and principal executive officer of Liberty since the death of his father. At the time of petitioner's marriage to Beverley in 1942, the owners of the issued common stock of Liberty were:

| | Shares |
|---|---|
| Petitioner, as executor of the estate of George F. Collins, Sr__ | 664 |
| Petitioner _____ | 167 |
| Petitioner's sister_____ | 167 |
| Frank P. Collins_____ | 1 |
| Earl Foster_____ | 1 |
| | 1,000 |

Petitioner had inherited his 167 shares from his mother.

The existing preferred stock of Liberty was retired in 1944 and new preferred was issued as a dividend on common. It was held at December 23, 1944, as follows:

| | Shares |
|---|---|
| Petitioner, as executor of the estate of George F. Collins, Sr__ | 5,976 |
| Petitioner _____ | 1,503 |
| Petitioner's sister_____ | 1,503 |
| Frank P. Collins_____ | 9 |
| Earl Foster_____ | 9 |
| | 9,000 |

In March 1945, the Liberty stock held by the estate of George F. Collins was distributed and the ownership thereafter was:

|  | Common | Preferred |
|---|---|---|
| Petitioner | 831 | 3,506 |
| Petitioner's sister | 1 | 5,476 |
| Trust for petitioner's children established by petitioner's sister | 166 |  |
| Frank P. Collins | 1 | 9 |
| Earl Foster | 1 | 9 |
|  | 1,000 | 9,000 |

Petitioner was trustee of the trust which had been established by his sister on December 30, 1944, for the benefit of his children.

On December 21, 1951, Liberty declared a stock dividend of common on common in the ratio of 160 to 1. Common stock ownership thereafter was:

| | |
|---|---|
| Petitioner | 132,960 |
| Petitioner's sister | 160 |
| Trust for petitioner's children | 26,560 |
| Frank P. Collins | 160 |
| Earl Foster | 160 |
|  | 160,000 |

There was no further change in common stock record ownership until Beverley received 26,592 shares on May 1, 1959. Petitioner, in 1956, 1957, and 1958, transferred 635 preferred shares to The George and Jennie Collins Foundation, a charitable trust. There have been no further changes in preferred stock ownership after those transfers.

During the times here pertinent, Liberty had some wholly owned subsidiaries whose contributions to Liberty's financial structure and earnings were minor.

The consolidated net worth of Liberty and its subsidiaries increased from $973,955.23 on December 31, 1942, to $5,425,509.40 on December 31, 1958. The following is a summary of the income and capital account growth of Liberty and its subsidiaries from 1942 to 1963:

| Year | Net sales | Earnings before income taxes | Adjusted earnings after taxes | Surplus without accounting for redemption of stock in 1962 and stock dividend in 1963 | Net worth (without account for stock redeemed) |
|---|---|---|---|---|---|
| 1942 | $2,044,312.53 | $284,568.61 | $121,166.94 | $854,258.05 | $973,955.23 |
| 1954 | 3,934,073.47 | 574,628.63 | 330,270.77 | 1,628,730.19 | 4,128,730.19 |
| 1955 | 4,977,343.98 | 741,880.89 | 310,848.31 | 1,942,828.88 | 4,442,828.88 |
| 1956 | 6,104,559.97 | 901,664.68 | 434,625.86 | 2,278,960.70 | 4,778,960.70 |
| 1957 | 6,077,834.46 | 821,140.34 | 429,876.13 | 2,521,065.93 | 5,021,065.93 |
| 1958 | 6,613,065.49 | 999,123.77 | 438,056.30 | 2,925,509.40 | 5,425,509.40 |
| 1959 | 7,343,692.38 | 1,164,585.92 | 543,323.11 | 3,419,867.79 | 5,919,867.79 |
| 1960 | 7,363,378.62 | 1,479,658.80 | 772,840.76 | 4,127,408.55 | 6,627,408.55 |
| 1961 | 7,728,535.15 | 1,436,211.10 | 647,527.81 | 4,734,702.83 | 7,234,702.83 |
| 1962 | 8,535,808.92 | 1,618,062.52 | 880,151.65 | 5,554,681.03 | 8,054,681.03 |
| 1963 | 8,339,463.14 | 1,230,032.09 | 549,662.54 | 6,104,040.38 | 8,508,165.98 |

On June 30, 1961, Liberty had net worth of $6,913,757.80.

Liberty consistently remained in a very liquid position during this period. It did not incur heavy outside liability. Its consolidated current assets, total assets, and total liabilities were as follows on the dates indicated:

| Year | Current assets | Total assets | Total liabilities |
|------|---------------|--------------|-------------------|
| 1942 | $771,065.29 | $1,128,666.86 | $154,711.63 |
| 1958 | 4,459,936.58 | 6,506,541.36 | 1,081,031.96 |
| 1960 | 5,208,867.36 | 7,827,132.58 | 1,199,724.03 |

During the 5 years preceding petitioner's divorce and the 5 years following it, Liberty paid dividends, salary to petitioner, and contributions to The George and Jennie Collins Foundation as follows:

| | Dividends | | Salary | Contributions |
|---|-----------|--------|--------|---------------|
| | Preferred | Common | | |
| 1954 | $22,500 | $17,500 | $61,629.84 | $22,756.78 |
| 1955 | 22,500 | 27,500 | 65,256.00 | 40,108.33 |
| 1956 | 22,500 | 52,500 | 70,940.61 | 43,154.81 |
| 1957 | 22,500 | 77,500 | 73,409.61 | 37,524.87 |
| 1958 | 22,500 | 27,500 | 76,589.51 | 53,456.09 |
| 1959 | 22,500 | 27,500 | 85,845.00 | 60,231.28 |
| 1960 | 22,500 | 42,800 | 87,860.00 | 67,190.80 |
| 1961 | 22,500 | 42,800 | 90,257.83 | 75,202.23 |
| 1962 | 22,500 | 36,019 | 95,312.80 | 69,890.26 |
| 1963 | 22,500 | 73,374 | 96,364.92 | 62,834.79 |

The interim consolidated balance sheet for the quarter ended March 31, 1959, for Liberty and its subsidiaries shows the following:

Current assets _____ $4,292,450.28
Other assets _____ 2,050,152.70

Total assets_____ 6,342,602.98
Liabilities and reserves_____ 842,514.68

Balance _____ 5,500,088.30

Preferred stock _____ 900,000.00
Common stock _____ 1,600,000.00
Surplus _____ 3,000,088.30

Net worth _____ 5,500,088.30

In the manufacture of both milk and soft-drink bottles, Liberty competed with Owens-Illinois Glass Co., Thatcher Glass Manufacturing Co., Inc. (hereinafter referred to as Thatcher), and Knox Glass, Inc. (hereinafter referred to as Knox). It competed also with Lamb Glass in the production of milk bottles and with Chattanooga Glass and Laurens Glass in the manufacture of soft-drink bottles.

Thatcher and Knox are comparable to Liberty in their product mix and the relative percentages composing the mix.

During the period 1954 through 1958 the common stock of Thatcher was sold on the New York Stock Exchange from a low of 13⅝ to a high of 38⅜ for an average selling price during those years of $21.01 per share. Thatcher reports its earnings on a calendar year basis, as does Liberty.

At least from 1955 through 1958, the common stock of Knox was traded actively over the counter. Prices ranged from a low of 5⅛ to a high of 33¼ for an average selling price during those years of $11.63 per share. Knox reports its earnings on the basis of a fiscal year ending September 30.

The average of the annual earnings per share of common stock of Liberty and Thatcher for the years 1954 to 1958, inclusive, and of Knox for the years 1955 to 1958, inclusive, were as follows:

|  | Per share |
|---|---|
| Liberty | $2. 15 |
| Thatcher | 2. 37 |
| Knox | 1. 85 |

The ratio of average selling prices per share of common stock to the average of annual earnings per share of common stock of Thatcher for the years 1954 to 1958, inclusive, and of Knox for the years 1955 to 1958, inclusive, was as follows:

| Thatcher | 8. 86 |
|---|---|
| Knox | 6. 29 |

The average selling prices of common stock of Thatcher and Knox for the years 1959 to 1961, inclusive, were respectively $28.96 and $22.65 per share.

The average of the annual earnings per share of common stock of Liberty, Thatcher, and Knox for the years 1959 to 1961, inclusive, was as follows:

|  | Per share |
|---|---|
| Liberty | $3. 95 |
| Thatcher | 1. 85 |
| Knox | 1. 14 |

The earnings per share of Liberty rose sharply from 1958 to 1960. Earnings per share, after taxes and payment of preferred dividends, were $2.60 for 1958, $3.26 for 1959, and $4.69 for 1960. Earnings per share dropped to $3.90 in 1961.

Neither Thatcher nor Knox is managed primarily by a single individual as is Liberty and both these corporations have more than one plant location while Liberty's entire operations are from a single plant.

On August 4, 1961, Beverley sold her 26,592 shares to Louis Yaeger of New York City for $900,000 or $33.84 per share. In the spring of

1961, Beverley and petitioner had discussed the possibility of Liberty's redeeming her shares but could not reach agreement as to a redemption price. Petitioner's highest offer was $500,000 for the 26,592 shares and Beverley's lowest offer was $750,000.

Petitioner was informed that Yaeger was the largest shareholder and a director of Thatcher. Immediately after purchasing Beverley's 26,592 shares of Liberty stock, Yaeger attempted to promote a merger of Thatcher and Liberty. Having Yaeger as a shareholder in Liberty created difficulty for petitioner in planning Liberty's operations. After considerable negotiations, Liberty redeemed the 26,592 shares from Yaeger on June 7, 1962, at a price of $1,300,000 or $48.92 per share.

Petitioner did not report any gain from the transfer of the 26,592 shares of stock of Liberty on his income tax return for the calendar year 1959. Respondent in his notice of deficiency increased petitioner's reported income by $440,092.40 of capital gain which he computed by subtracting from the amount he determined to be the fair market value of the stock transferred, $900,000, petitioner's basis in the shares transferred of $19,815.19, and by considering 50 percent of the resulting gain realized of $880,184.81 ($440,092.40) to be the taxable net long-term capital gain. Respondent computed the deficiency determined on the basis of the alternative tax on capital gain.

### ULTIMATE FINDINGS OF FACT

Petitioner's transfer of 26,592 shares of Liberty stock to Beverley constitutes a disposition of that stock of a type which gave rise to taxable gain.

The fair market value of the 26,592 shares of Liberty stock on May 1, 1959, was $20 per share.

### OPINION

Petitioner takes the position that Beverley's receipt of the 26,592 shares of Liberty stock was, under Oklahoma law, merely a receipt of what "belonged to her" and therefore the transfer did not constitute a disposition of property by petitioner resulting in a taxable gain to him. Respondent contends that Beverley had no property interest in the 26,592 shares of Liberty stock prior to their transfer to her by petitioner and therefore the transfer resulted in a disposition of the stock by petitioner on which gain was realized which is includable in petitioner's income. Respondent argues that since petitioner owned the Liberty stock before his marriage to Beverley, this stock was, under Oklahoma law, his separate property and that since Beverley was not employed outside the home during her marriage to petitioner, the spouses had no property jointly acquired during marriage.

Under Oklahoma law property owned by one spouse before marriage or property inherited by a spouse is his or her separate property, but if the property increases in value due to the joint efforts of the parties during marriage it may be considered by the court having jurisdiction of the divorce as in the nature of jointly acquired property. *Moyers* v. *Moyers*, 372 P. 2d 844 (Okla. Sup. Ct. 1962). The efforts of the wife need not be outside the home for her contribution to be such as to cause property acquired during marriage to be jointly acquired property. *Funk* v. *Funk*, 319 P. 2d 599 (Okla. Sup. Ct. 1957), and *Roberts* v. *Roberts*, 357 P. 2d 980 (Okla. Sup. Ct. 1960).

In the instant case we agree with respondent that petitioner has not shown what precise property held either by him or by Beverley was property jointly acquired during marriage. What has been shown is that petitioner and Beverley had "some" jointly acquired property and in recognition of this fact the decree of the Oklahoma court approved the property settlement agreed to by the parties. The decree of the Oklahoma court in a proceeding which was adversary recognized that the property settlement agreement which it approved made an equitable division of the rights of each party in jointly acquired property. See *Swanson* v. *Wiseman*, an unreported case (W.D. Okla. 1961, 7 A.F.T.R. 2d 824, 61–1 U.S.T.C. par. 9264). Under these circumstances, we conclude as a factual matter, (1) that petitioner and Beverley had property jointly acquired during marriage within the meaning of the Oklahoma law, (2) that the precise items of this jointly acquired property are not shown, (3) that the property settlement approved by the divorce decree provided for the transfer to Beverley of 26,592 shares of Liberty stock held in petitioner's separate name and certain miscellaneous items of property and for the transfer to petitioner of 10 shares of stock of Red Ball, Inc., held in the name of Beverley and certain miscellaneous items of property in satisfaction of whatever rights either party had in the jointly acquired property or the separate property of the other, (4) that other portions of the decree adequately provided for alimony for Beverley and for support of the minor children of the parties to the divorce, and (5) that the portions of the agreement dealing with the transfer of the shares of Liberty and other miscellaneous property were a settlement of property rights and not additional alimony. Having determined from the evidence our conclusory facts, there remains the problem of whether as a matter of law petitioner made a disposition of the 26,592 shares of Liberty stock at a gain which is includable in his taxable income.

Both parties cite and discuss the case of *United States* v. *Davis*, 370 U.S. 65 (1962). In that case the Supreme Court held that a transfer of property by a husband to his wife incident to a Delaware divorce proceeding resulted in a taxable gain to the husband of the

difference in the fair market value on the date of transfer of the property transferred and the husband's basis in the transferred property. In the *Davis* case the Court pointed out that income as defined in the revenue laws includes income from transactions in property, that the increment in value of property does not constitute income until a disposition of the property is made, and that upon disposition of property the gain therefrom is taxable.[1] Since a division of property between coowners would not be a disposition by either of property, there would be no gain realized by either upon such a division. However, an exchange of property for other property, which other property could consist of a release of an independent legal obligation, does constitute a disposition of property which may result in a gain which is includable in the income of the person making the transfer of the property. In the *Davis* case the Court stated that, "the inchoate rights granted a wife in her husband's property by the Delaware law do not even remotely reach the dignity of co-ownership."[2] The Court recognized that the view it took might "permit different tax treatment among the several States," but stated that it had in the past "not ignored the differing effects on the federal taxing scheme of substantive differences between community property and common-law systems."

Petitioner does not contend that the Oklahoma law creates a property right in spouses in all particulars similar to the rights created in a community property State. He does, however, argue that the rights of each spouse under Oklahoma law[3] in the property acquired jointly

---

[1] Sec. 1001, I.R.C. 1954, provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis of the property and that the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

[2] The Delaware law to which the Supreme Court referred is Del. Code Ann. tit. 13, sec. 1531, which provides:

1531. Allowance or division of property upon divorce granted for aggression.

(a) When a divorce shall be decreed for the aggression of the husband, the complainant shall be restored to all her real estate, and allowed, out of her husband's real and personal estate, such share as the court thinks reasonable; but if the divorce be for the wife's aggression, the court may restore the whole or a part of her real estate, and also such share of her husband's personal property as seems reasonable.

(b) Any allowance or division of property under subsection (a) of this section may be by a gross sum, or an annual allowance, or an assignment by metes and bounds. The court may appoint commissioners to execute any order in the premises, and may issue writs of possession, as in case of land sold on execution process.

[3] Okla. Stat. Ann. tit. 12, sec. 1278 (1961): Disposition of property—Restoration of wife's maiden name—Alimony.

When a divorce shall be granted by reason of the fault or aggression of the husband, the wife shall be restored to her maiden name if she so desires, and also to all the property, lands, tenements, hereditaments owned by her before marriage or acquired by her in her own right after such marriage, and not previously disposed of, and shall be allowed such alimony out of the husband's real and personal property as the court shall think reasonable, having due regard to the value of his real and personal estate at the time of said divorce; which alimony may be allowed to her in real or personal property, or both, or by decreeing to her such sum of money, payable either in gross or in installments, as

during marriage is more comparable to the ownership in the property created under community property laws than to the "burden" placed upon the husband's property or "personal liability" of the husband to the wife which the Court in the *Davis* case considered to be the effect of the Delaware law.

Under Oklahoma law, property acquired jointly during marriage is "very similar in conception to the community property of the community property states, [and] is regarded as being held by a species of common ownership." *Thompson* v. *Thompson*, 70 Okla. 207, 173 Pac. 1037 (Sup. Ct. 1918). Alimony is separately provided for by the statute as is child support. The division of jointly acquired property is not made on the basis of the obligation of a husband to provide for his wife and children. It is a division of property between husband and wife in recognition of the fact that each has contributed during the marriage to its acquisition. *Tobin* v. *Tobin*, 89 Okla. 12, 213 Pac. 884 (Sup. Ct. 1918). The Oklahoma law was derived from the Kansas law. *Vanderslice* v. *Vanderslice*, 195 Okla. 496, 159 P. 2d 560 (Sup. Ct. 1945). In *Putnam* v. *Putnam*, 104 Kans. 47, 177 Pac. 838 (Sup. Ct. 1919), the court explained the philosophy of the division of jointly acquired property by a divorce court as follows:

> But a wife has certain rights and interests in property acquired by the husband during the existence of the marriage relation which, with the aid of the statute, the courts upon proper occasion will recognize and protect. Without such statute these rights of the wife would be imperfect and unenforceable, but they would morally exist nevertheless, and they only need such statute to give them legal vitality. * * *

> * * * In pioneer times the family usually commenced life with little or no property. Land was cheap and easily acquired. The combined efforts and economies of the husband and wife for a long stretch of years usually resulted in prosperity, in the accumulation of the familiar forms of Kansas property.

---

the court may deem just and equitable. As to such property, whether real or personal, as shall have been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties. the court shall make such division between the parties respectively as may appear just and reasonable. by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to pay such sum as may be just and proper to effect a fair and just division thereof. In case of a finding by the court, that such divorce should be granted on account of the fault or aggression of the wife, the court may set apart to the husband and for the support of the children, issue of the marriage, such portion of the wife's separate estate as may be proper.

Okla. Stat. Ann. tit. 12, sec. 1275 (1961). Parties in equal wrong—Custody of children—Disposition of property.

The parties appear to be in equal wrong shall not be a basis for refusing to grant a divorce, but if a divorce is granted in such circumstances, it shall be granted to both parties. In any such case or where the court grants alimony without a divorce or in any case where a divorce is refused, the court may for good cause shown make such order as may be proper for the custody, maintenance and education of the children, and for the control and equitable division and disposition of the property of the parties, or of either of them, as may be proper, equitable and just, having due regard to the time and manner of acquiring such property, whether the title thereto be in either or both of said parties. R.L. 1910, § 4966; Laws 1955, p. 142, § 1.

During the years of mutual industry, self-denial, and domestic harmony of the married couple, it would not ordinarily be important whether each succeeding tract of land or other property acquired by their joint efforts was taken in the name of the husband or wife. If they lived together happily both would enjoy the property, and upon the death of one of them, the other's half interest would completely mature, and the statute of wills and of descents and distributions would protect it. If their marital partnership—for the joint accumulations of property by a husband and wife are slightly analogous to that of a partnership—is wrecked by marital discord and their troubles become the concern of a divorce court, the court may equitably divide the property accumulated during the marriage relation. * * *

When a petition for divorce has been filed, a division of jointly acquired property may be made even though no divorce is granted. *Miles* v. *Jones*, 197 Okla. 684, 173 P. 2d 949 (Sup. Ct. 1946). However, in Oklahoma one spouse has no vested interest in the jointly acquired property separately held by the other spouse prior to action by a court incident to a petition for divorce. *Jones* v. *Farris*, 180 Okla. 341, 69 P. 2d 344 (1937). Also, the amount of the jointly acquired property to be set apart to each spouse is a "reasonable" amount in the discretion of the court and no part of such property is necessarily granted to a spouse whom the court finds to have been wasteful and extravagant during the marriage. *Tobin* v. *Tobin*, *supra*.

The Oklahoma law is also clear that a spouse has no right to a particular item of the jointly acquired property not held in his or her name. In fact the spouse's interest in the jointly acquired property may be satisfied under Oklahoma law by having the other spouse transfer to him or her money or a portion of his or her separate property. See *Thompson* v. *Thompson*, *supra*. The two major differences between a division of property under the Oklahoma law and the division between coowners to which the Supreme Court was referring in the *Davis* case are the fact that in Oklahoma no vested interest in separately held property of one spouse exists in the other spouse until a transfer incident to a divorce proceeding is made and under Oklahoma law the division is not necessarily effected by splitting up of the jointly acquired property. In the instant case the facts show that petitioner had substantial property other than the Liberty stock and presumably, since the record does not show to the contrary, some of this property was as much jointly acquired property, and perhaps more so, than the Liberty stock.

Beverley had no specific interest in the Liberty stock as distinguished from her general interest in all property jointly acquired by her and petitioner during their marriage. Therefore, the transfer to Beverley of 26,592 shares of Liberty stock was not a division of jointly owned stock as might have been the situation in a community property

State if the stock were considered community property or the situation existing when the spouses are legally joint owners of the property divided.

The independent legal obligation which was satisfied by petitioner's transfer of the Liberty stock to Beverley was different from that satisfied by the taxpayer in the *Davis* case when he transferred property to his wife. However, in our view petitioner did transfer the Liberty stock to Beverley in return for release from an independent legal obligation. This legal obligation was the release of the burden placed by Oklahoma law on property held in his name. This burden was the requirement that a portion of such of it as was jointly acquired be transferred to Beverley or Beverley be paid a just and reasonable amount in recognition of her interest in the jointly acquired property. Petitioner and Beverley held no property in coownership and the record does not show what specific items of their property were jointly acquired. In our view the Supreme Court in the *Davis* case in referring to property being divided between coowners was using the term to mean property jointly owned by husband and wife. Property may be jointly owned where title is taken jointly or because of the community property laws of a State. Neither of these circumstances applies to the property of petitioner and Beverley. The type of transaction here involved as was the one in the *Davis* case, is more in the nature of an exchange of property than a division of property between coowners. Such an exchange is a disposition which gives rise to taxable gain to the extent that the value of the property received in exchange for the stock exceeds petitioner's basis in the stock. *Jessie Lee Edwards*, 22 T.C. 65 (1954).

Here, as in the *Davis* case, the value of the rights released by Beverley in exchange for the 26,592 shares of Liberty stock can only be determined by assuming that they equal the value of the stock transferred. It is therefore necessary for us to resolve the issue of the fair market value of the 26,592 shares of Liberty stock on May 1, 1959, the date of the transfer by petitioner of this stock to Beverley.

Respondent, in support of his valuation of the 26,592 shares of Liberty stock at $900,000, states that the situation is the same as if petitioner transferred $1 million in cash to Beverley, and she transferred $900,000 back to him for the stock. Respondent argues that the stock and the $110,000 in cash were given to Beverley in lieu of the $1 million that Beverley wanted in cash. The short answer to this contention of respondent's is that there is no evidence to support it. Beverley did state in her testimony that she had instructed her attorneys that she would like to have as much alimony as she could get and $1 million in cash. However, the evidence does not show that her attorneys ever proposed such a cash settlement to petitioner and

does not show that petitioner even tentatively agreed to such a settlement.

Respondent argues that if the transaction is not viewed as a purchase of the stock for $900,000, his determination should be sustained on the ground that petitioner has failed to prove error in the valuation of $900,000 as of May 1, 1959, that he placed on the 26,592 shares of Liberty stock. The evidence likewise fails to support this contention of respondent. The evidence which we have to some extent detailed in our findings, amply demonstrates that as of May 1, 1959, the value of 26,592 shares of Liberty stock was substantially less than $900,000. Petitioner offered the testimony of two witnesses qualified in valuation matters, one of whom valued the stock at $18.75 per share on the basis of comparisons of the Liberty stock with the stock of Thatcher and Knox. After coming to a tentative valuation, this witness discounted the tentative value of Liberty stock determined by a comparison with Thatcher and Knox by 25 percent because of Liberty being a closely held company in arriving at the $18.75 per share value. Petitioner's other witness placed a value as of May 1, 1959, on the stock on a capitalization basis ranging from a low of $10.77 per share to a high of $29.89 a share prior to the application of any discount and to these values applied discounts of 25, 35, and 40 percent. On this basis and also by consideration of the financial data of Liberty and a comparison of Liberty with Thatcher and Knox, this witness arrived at an opinion that the value of the Liberty stock on May 1, 1959, was $18 per share.

The book value of the 26,592 shares of Liberty stock as of March 31, 1959, the closest date to May 1, 1959, for which there is an interim balance sheet of Liberty available, is approximately $28.75 per share. As petitioner's witnesses testified in a closely held company such as Liberty, it would be quite unlikely that a minority interest would bring the book value of the stock.

Respondent points to the sale of the stock made by Beverley on August 4, 1961, for $900,000 and the redemption of this stock by Liberty in 1962 for $1,300,000 as indicative of the fair market value of the stock on May 1, 1959. In view of the fact that these sales were substantially subsequent to May 1, 1959, and also in view of the circumstances surrounding these sales, we consider these transactions to have little value as evidence of the fair market value of the stock on May 1, 1959. However, if the sale for $900,000 is considered, it must be considered in the light of the earnings per share of Liberty stock having substantially increased between the year ended December 31, 1958, and the year ended December 31, 1960, and the book value of the stock having also substantially increased. The amount of $33.84 which is the per share amount for which Beverley sold the stock on August 4, 1961, is 7.2 times the 1960 earnings per share of Liberty.

The earnings of Liberty per share for the year ended December 31, 1958, times 7.2 results in an amount of approximately $18.75, the fair market value of Liberty stock on May 1, 1959, arrived at by one of petitioner's witnesses. However, an interim balance sheet for Liberty as of March 31, 1959, and other information with respect to Liberty which a prospective purchaser of stock would certainly make himself aware of, would indicate that Liberty's average earnings were increasing as of the end of 1958 and the beginning of 1959 and that some consideration should be given to such increase.

Respondent argues that the earnings of Liberty should not be considered in comparison to those of Thatcher and Knox because of the high salary payments to petitioner and the payments to The George and Jennie Collins Foundation. Respondent does not question the reasonableness of these payments. These payments are in the control of one individual and it is reasons of this type that cause closely held stock very often not to be as valuable on a basis comparable to book value or earnings value ratio as listed stock. However, since in both 1958 and 1960 the situation was similar with respect to the payments to petitioner and to The George and Jennie Collins Foundation, a comparison of value of the Liberty stock as an amount times the Liberty earnings would not be affected by the amount of salary payment or amount paid to The George and Jennie Collins Foundation.

Considering all the facts we have concluded and found as an ultimate fact that as of May 1, 1959, the 26,592 shares of Liberty stock had a fair market value of $20 per share and we so hold.

*Decision will be entered under Rule 50.*