[No. 958-2. Division Two. January 31, 1974.]

EDMOND P. RICHARDS, *Respondent,* v. PACIFIC NATIONAL
BANK OF WASHINGTON *et al., Appellants.*

*John F. Hansler* (of *Comfort, Dolack, Hansler & Billett*),
for appellants.

*Edward M. Lane* and *Douglas V. Alling* (of *Murray, Scott, McGavick, Gagliardi, Graves, Lane & Lowry*), for respondent.

ARMSTRONG, J.—Pacific National Bank of Washington and John F. Hansler, coexecutors of the estate of Ben B. Cheney, deceased, have appealed from an adverse judgment of $75,075 entered against the estate in favor of plaintiff, the Richards partnership, for photographic services performed by the Richards partnership over an approximate 25-year period prior to Mr. Ben Cheney's death.

From the 11-thousand-page record, plus over 200 exhibits introduced during the 3-week trial in this case, defendant has produced 17 assignments of error. The primary issues raised are whether an implied contract for continuous photographic services had been legally established, and whether enforcement of the contract was barred by the statute of limitations. We affirm the ruling of the trial court that an implied contract had been established and that its enforcement was not barred by the statute of limitations.

 It has been frequently held that a party seeking to establish a claim against an estate for services rendered to the decedent during his or her lifetime has the burden of proving an express or implied contract to pay for the services, and the evidence to support such claim must be clear, cogent and convincing. *Jacobs v. Brock,* 66 Wn.2d 878, 883, 406 P.2d 17 (1965); *Johnson v. Suddreth,* 59 Wn.2d 517, 368 P.2d 907 (1962); *Johnson v. Nasi,* 50 Wn.2d 87, 309 P.2d 380 (1957). This is the equivalent of saying that the ultimate fact in issue, in this case the existence of the agreement, must be shown by the evidence to be "highly probable." *In re Sego,* 82 Wn.2d 736, 739, 513 P.2d 831 (1973); *see Cook v. Cook,* 80 Wn.2d 642, 497 P.2d 584 (1972).

Of course, since this was a claim against the estate of a decedent, the testimony, whether clear, cogent and convincing or otherwise, had to be first painstakingly scrutinized to determine whether any witness had run afoul of RCW 5.60.030, the statute prohibiting a party in interest from tes-

tifying in his own behalf as to transactions with, or statements made by, the decedent. The existence of RCW 5.60.030, commonly called the "dead man statute," which was enacted for the laudable purpose of preventing frauds against the estates of those no longer present to defend themselves, but which in practical application often becomes but a fishbone in the throat of the law, in this case required the plaintiff to attempt to prove an implied rather than an express contract.

A contract implied in fact has been defined as follows:

> An implied contract is an agreement depending for its existence on some act or conduct of the party sought to be charged and arising by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other. The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them.

*Johnson v. Nasi, supra* at 91. According to the general rule, in the absence of circumstances indicating otherwise, it can be inferred that a person who requests another to perform service of value to him thereby bargains and by implication agrees to pay for such services. *Hardung v. Green,* 40 Wn.2d 595, 597, 244 P.2d 1163 (1952). Similarly, where there is a lack of mutuality in the benefits received, a promise to pay may be implied. *Allerton v. Allerton,* 133 Wash. 260, 266, 233 P. 632 (1925); *see generally Jacobs v. Brock, supra* at 884; second appeal, *Jacobs v. Brock,* 73 Wn.2d 234, 239, 437 P.2d 920 (1968); *Heasley v. Riblet Tramway Co.,* 68 Wn.2d 927, 935, 416 P.2d 331 (1966); *Culligan v. Old Nat'l Bank,* 1 Wn. App. 892, 465 P.2d 190 (1970).

In this case the record discloses that for more than 25 years Robert Richards and Richards Commercial Photo Service performed photographic services from time to time for Richards' good friend, Ben Cheney, who became one of

Tacoma's most prominent business and sports personalities. Mr. Cheney died in May 1971, leaving an estate in excess of $10 million. Plaintiff Edmond Richards, the surviving brother and partner of Robert Richards, filed a claim against the Cheney estate for previously unbilled services rendered on behalf of Mr. Cheney. Plaintiff's claim was predicated on the contention that an agreement existed between the Richards partnership and Mr. Cheney to take photographs of Mr. Cheney's life on a continuing basis, to eventually be incorporated in a "photographic history."

In support of this contention plaintiff adduced the testimony of Mrs. Rae Richard Hess, previously a free-lance journalist, who had written for such publications as Time, Colliers, and Readers Guide. Mrs. Hess testified that while in San Francisco in 1949, Mr. Cheney had asked her if she would be interested in writing his biography. She testified that Mr. Cheney told her:

> that the studio had been making a photographic study of his life; that all aspects of his life and activities were being covered. It was a continuing thing, and it would encompass everything he was planning to do, and it would go on for some time. This is the sort of thing I had done for biographies.

When questioned as to why she did not accept the project, Mrs. Hess testified that she was too busy at that time and that, "a job of that kind would take almost continuous work because it was a continuing thing, it would go on for many years." Indeed, Edmond Richards testified as follows:

> When we received an assignment, irrespective of the time, day or night, or whatever day of the week it may be, either my brother Bob would fulfill the request, or a competent photographer, and there they would do the photographing service, whatever is required of them, irrespective of the length of time it took.

The record does, in fact, reflect that during the period of time in question, hundreds of work orders were written for Cheney assignments, including photography of Mr. Cheney's family life, personal possessions, business enterprises,

involvement in athletics, and personal trips. An enormous quantity of photographic work was introduced into evidence, and a photographic history was eventually completed.

Mrs. Nancy K. Walter testified that in January of 1965, she had a discussion with Mr. Cheney in regard to assisting him in the compilation of some photographic albums. She testified that Mr. Cheney told her that he had a series of prints that he wanted incorporated in album form. Mr. Cheney showed her boxes of materials that he had available. Mrs. Walter testified:

> He showed me the boxes that he had of various pictures that he had collected through the years, and he said that the Studio had taken several pictures in the past, and he wanted it collaborated and to have a pictorial of everything that he had accomplished in his life time.

The assembly of photographic albums thus began in 1965. Mrs. Walter did not place every print available in the albums, but selected individual pictures from the enormous quantity available in order to adequately portray the life of Mr. Cheney. Some of the available material consisted of clippings, postcards, and old photographs of odd sizes and shapes collected in an extensive scrapbook kept by Mr. Cheney's grandmother, as well as by other relatives. These the Richards Studio would rephotograph and then reprint, so that uniformly sized copies could be inserted in the albums and the originals could be filed away for safekeeping.

The photographic history eventually completed consisted of 79 separate and bound photograph albums which were specially designed by the Richards partnership, and included a unique leather cover with gold lettering of the title of the volume and the Cheney crest on each volume. By way of example, there were numerous albums devoted to Cheney athletic teams, 14 albums to Cheney business operations, one volume was devoted to each of Mr. Cheney's four personal residences and one album each to his airplanes, boats and cars. There can be no question but that

the photographic services rendered by plaintiff were of great monetary and personal value to Mr. Cheney.

Defendant contends that there was mutuality of benefit between the decedent and the Richards Studio, and thus one of the vital elements to support an implied contract is missing. Defendant suggests that mutual benefit can be found in the fact that the Cheney account was a desirable business connection which might have led plaintiff to render gratuitous services to maintain the account; or in the fact that there was a close personal friendship between Robert Richards and Ben Cheney which might have prompted Richards to sacrifice financial gain for Mr. Cheney's goodwill; or in the fact that Robert Richards was taken along on lavish and expensive vacation trips because he was Mr. Cheney's photographer and that these were in the nature of "fringe benefits" for rendering the photographic services.

We are not persuasively impressed by these arguments. The record indicates that the Richards partnership rendered more than $90,000 worth of photographic services for which the partnership received no monetary compensation. The argument that there was mutual benefit in this case is without merit.

Defendant also contends that there was no actual or implied intention on the part of Mr. Cheney to compensate plaintiff for the services rendered, nor was there an expectation of remuneration on the part of the plaintiff. The basis of defendant's argument is the fact that plaintiff did receive compensation for numerous photographic services of a similar type rendered on behalf of Mr. Cheney, and corporations controlled by him, during the same period covered by the claim involved in this appeal. Defendant argues that the inference and presumption is that plaintiff accepted the sums paid as payment in full for *all* services rendered during Mr. Cheney's lifetime. *See Ammerman v. Old Nat'l Bank*, 28 Wn.2d 239, 249, 182 P.2d 75 (1947).

In this regard it may be noted that Edmond Richards, on direct examination, was asked whether his com-

pany expected payment for the services in question. The trial court sustained an objection as to what the company expected, but allowed Mr. Richards to testify that he certainly expected that the account would be paid. Defendant contends that Mr. Richards' unexpressed state of mind is irrelevant. In support of this position defendant cites *Plumbing Shop, Inc. v. Pitts*, 67 Wn.2d 514, 408 P.2d 382 (1965). However, that case merely reiterated that Washington adheres to the objective manifestation theory in construing the words and acts of alleged contractual parties and that unexpressed intentions are nugatory. *Plumbing Shop, Inc. v. Pitts, supra* at 517. In this case one of the central questions was whether the services rendered by Robert Richards and the photo studio were rendered under circumstances indicating an expectation of payment. It was certainly not an abuse of discretion for the trial court to allow this testimony. *Cf. Jacobs v. Brock, supra* at 237.

Defendant also objected to Edmond Richards' testimony that the Cheney work orders in question were in a separate file for future billing upon completion of the services. This testimony related to acts of the witness alone, and involved the rendition of services for the decedent, not a transaction *with* the decedent. As such, the testimony was not barred by the dead man statute. *Woeppel v. Simanton*, 53 Wn.2d 21, 26, 330 P.2d 321 (1958).

Defendant further contended that the dead man statute bars Edmond Richards' testimony that "someone" requested billings for specific services during the period in question not involved in the claim herein. However, prior to his answer the witness was repeatedly cautioned to eliminate from his testimony any reference to conversations or transactions with the decedent. *See Kauffman v. Baillie*, 46 Wash. 248, 252, 89 P. 548 (1907). Under the circumstances this testimony was admissible.

We are satisfied that the record contains clear, cogent and convincing evidence that Mr. Cheney requested photographic services which were of great value to him and which were rendered under circumstances where there was

no mutuality of benefit. From the facts in this case a promise and intention on the part of Mr. Cheney to compensate plaintiff for the services rendered can therefore be implied. *Jacobs v. Brock, supra* at 885.

Having found the requisite degree of evidence to support an implied contract to perform continuous photographic services at the request of the defendant, the next issue to be discussed is whether the contract is unenforceable because of the statute of limitations, RCW 4.16.080(3).

Defendant contends that as each separate photographic service was completed by the plaintiff, the cause of action for that service accrued, and the statute began to run. The test, defendant argues, is whether the services are entire and continuous, or are severable and distinct, with no identifying continuity. Annot., 60 A.L.R.2d 1008, 1017 (1958).

Suffice it to say that the trial court specifically found, and we agree, that there was clear, cogent and convincing evidence to support an implied contract for "continuing and overlapping services." The statute of limitations on amounts due under a contract for continuous service does not begin to run until the contract is terminated. *Macchia v. Salvino,* 64 Wn.2d 951, 955, 395 P.2d 177 (1964); *Heasley v. Riblet Tramway, supra* at 937; *Culligan v. Old Nat'l Bank, supra;* Annot., 7 A.L.R.2d 198 (1949). The classic Washington case is *Ah How v. Furth,* 13 Wash. 550, 43 P. 639 (1896), wherein the court quoted at page 552:

> "Where services are rendered under an agreement which does not fix any certain time for payment, nor when the services shall end, the contract of employment will be treated as continuous, and the statute of limitations will not begin to run until the services are ended."

We therefore hold that plaintiff's cause of action did not accrue until completion of the contract, which occurred at decedent's death. Plaintiff's action was therefore not barred by the statute of limitations.

Defendant argues that the amount of the judgment in this case cannot be supported, apparently on the basis that some of the claimed photographic services were of a

"business" nature, or were not Mr. Cheney's personal obligation, but were corporate in nature. The testimony of Edmond Richards was that the total value of all services rendered for Mr. Cheney for which payment had not been received was $96,980. The trial judge, in his oral decision, indicated it was clear that certain of the claimed areas of recovery should be disallowed, and that certain of the photographic services were of an "overlapping nature;" that is, some of the photographs were emblazoned with symbols used for business purposes, but were nevertheless included within the albums. Most significantly, however, the trial judge, as trier of fact, related that the claimed items that were not proven by clear, cogent and convincing evidence were disallowed. The trial court rendered a judgment in favor of plaintiff in the amount of $71,500 plus sales tax, or a total of $75,075. Since the judgment of the trial court was well within the range of the evidence presented at trial, the award of damages will not be disturbed on appeal. *Flannery v. Bishop,* 81 Wn.2d 696, 703, 504 P.2d 778 (1972); *Steele v. Queen City Broadcasting Co.,* 54 Wn.2d 402, 341 P.2d 499 (1959).

We have examined the defendant's additional assignments of error and find them to be merely cumulative or substantially without merit.

The judgment is affirmed.

PEARSON, C.J., and PETRIE, J., concur.

Petition for rehearing denied March 27, 1974.

Review denied by Supreme Court June 17, 1974.