RICHARD C. BROWN AND JOAN C. BROWN, ET AL, [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Brown v. Commissioner
Docket Nos. 10262-76, 10263-76, 10264-76, 10265-76, 10266-76, 10267-76, 10268-76.
United States Tax Court
T.C. Memo 1980-267; 1980 Tax Ct. Memo LEXIS 318; 40 T.C.M. (CCH) 725; T.C.M. (RIA) 80267; July 22, 1980, Filed Donald A. Cable and Mark A. Golding, for the petitioners. Kenneth W. McWade, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner, in his statutory notices of deficiency, determined the following *320 deficiencies in Federal income tax against petitioners: Docket
Taxable
Deficiency
No.
Petitioner
Year
in Tax
10262-76
Richard C. & Joan C. Brown
1973
$ 466.41
10263-76
Wesley N. & Alberta Y. Tefft
1973
1,898.61
10264-76
William W. & Mary M. Henshaw
1973
1,887.13
10265-76
William H. & Wendy S. Jordanh1973
546.30
10266-76
Cyril M. & Phyllis A. Frol
1972
5,377.40
1973
1,993.39
10267-76
Einar & Geraldine Henriksen
1973
3,102.00
10268-76
Henry W. & Dorothy E. Anderson
1973
1,710.03
Petitioners have conceded the correctness of several of the adjustments made by the Commissioner, and the correctness of the remainder of such adjustments hinges on our decision of the sole remaining issue.We must determine whether certain liabilities may be treated by petitioners as part of their shares of the liabilities of a limited partnership, thus increasing their adjusted bases in the limited partnership so that they may deduct losses generated by such partnership. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners *321 Richard C. Brown (hereinafter Brown) and Joan C. Brown filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Seattle, Washington, when they filed their petition in this proceeding. Petitioners Wesley N. Tefft (hereinafter Tefft) and Alberta Y. Tefft filed a joint Federal income tax return for the taxable year 1973 wih the Internal Revenue Service Center, Ogden, Utah. They resided in Bellevue, Washington, when they filed their petition in this proceeding. Petitioners William W. Henshaw (hereinafter Henshaw) and Mary M. Henshaw filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Bainbridge, Washington, when they filed their petition in this proceeding. Petitioners William H. Jordan (hereinafter Jordan) and Wendy S. Jordan filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Seattle, Washington, when they filed their petition in this proceeding. Petitioners Cyril M. Frol (hereinafter Frol) and Phyllis A. Frol filed joint *322 Federal income tax returns for the taxable years 1972 and 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Seattle, Washington, when they filed their petition in this proceeding. Petitioners Einar Henriksen (hereinafter Henriksen) and Geraldine Henriksen filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Seattle, Washington, when they filed their petition in this proceeding. Petitioners Henry W. Anderson (hereinafter Anderson) and Dorothy E. Anderson filed a joint Federal income tax return for the taxable year 1973 with the Internal Revenue Service Center, Ogden, Utah. They resided in Seattle, Washington, when they filed their petition in this proceeding. Joan C. Brown, Alberta Y. Tefft, Mary M. Henshaw, Wendy S. Jordan, Phyllis A. Frol, Geraldine Henriksen, and Dorothy E. Anderson are parties to this action solely because they filed joint returns with their petitioner-husbands for the relevant taxable years.Therefore, the term "petitioners" will hereinafter refer to Brown, Tefft, Henshaw, Jordan, Frol, Henriksen, and Anderson. On November 7, 1969, a corporation, *323 Nuwestern American, Inc. (hereinafter Nuwestern), was organized under the laws of the State of Washington. At all relevant times, the common stock of Nuwestern, which was its only class of authorized stock, was held by these stockholders in the following percentages: Stockholder
Percentage
Brown
25%
Jordan
25%
Frol
25%
Patrick R. Jeppeson
25%
Frol was at all relevant times the president of Nuwestern. On September 25, 1970, River Park Associates (hereinafter River Park), a Washington limited partnership, was formed by the execution and filing of an appropriate certificate of limited partnership on that date. Nuwestern was and is the sole general partner of River Park. River Park filed its United States Partnership Return of Income, Form 1065, on a calendar year basis. Under the terms of the limited partnership agreement, the net profits are to be shared and the losses are to be borne by all the partners, both general and limited, in direct proportion to the number of units in the partnership held by each partner. However, no limited partner can be required to contribute any cash or property to the partnership in excess of his initial contribution thereto. *324 The initial contribution of the partners resulted in the issuance to them of the following number of units in River Park: General Partner
Nuwestern
8 units
Limited Partners
Brown
23 units
Frol
23 units
Jordan
23 units
Patrick R. Jeppesen
23 units
On September 28, 1970, the limited partnership agreement of River Park was amended to allow the addition of more limited partners and the sale of partnership units to the new and old limited partners. Pursuant to Washington law, an amended certificate of limited partnership was filed on that date to reflect the addition of the new limited partners. After the new partners were admitted and the additional units were distributed, all of the issued units in River Park were held as follows: Percentage
General Partner
Units
Ownership
Nuwestern
8
4
Limited Partners
Brown
35-1/2
17.75
Frol
35-1/2
17.75
Jordan
35-1/2
17.75
Patrick R. Jeppesen
35-1/2
17.75
Anderson
10
5
Tefft
10
5
Myron A. Bass
10
5
Henshaw
10
5
Henriksen
10
5
On the partnership information returns filed by River Park for its taxable years 1972 and 1973, income and loss of the partnership was allocated *325 thusly: Profit and Loss-Sharing
General Partner
Percentage
Nuwestern
4
Limited Partners
Brown
11-1/2
Frol
14-1/4
Jordan [1]
11-1/2
Patrick R. Jeppesen
11-3/4
Anderson
5
Tefft
10
Myron A. Bass
10
Henshaw
5
Henriksen
12
David F. Purnell
5
On December 29, 1969, Nuwestern purchased a piece of undeveloped real property (hereinafter the property) in Spokane, Washington, for $75,000. Though Nuwestern assumed a liability in the amount of $33,288 as part of the consideration paid for the property, the treatment of that liability is not an issue in this case. On September 1, 1970, a mortgage and mortgage note for $1,193,500 were executed by Nuwestern in favor of Commerce Mortgage Company (hereinafter Commerce) for purposes of financing the construction of an apartment complex (the River Park Apartments) on the property. Commerce drafted the loan documents. Neither the mortgage note nor the mortgage securing such note (hereinafter referred to in the aggregate as the Commerce loan) *326 contained any language limiting Nuwestern's liability for payment of the principal and interest due under the note.
The payment of the Commerce loan was guaranteed by the United States Department of Housing and Urban Development, Federal Housing Administration (FHA). In conjunction with the FHA guarantee, Nuwestern executed a Regulatory Agreement for Multi-Family Housing Projects (the regulatory agreement) which contained these two pertinent provisions: 1. Owners [Nuwestern], except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage [the Commerce loan]. * * *
17. The following owners: NONE
do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely: (a) for funds or property of the property coming into their hands which, by the provisions thereof, they are not entitled to retain; and (b) for their own acts and deeds or acts and deeds of others which they have *327 authorized in violation of the provisions hereof. The regulatory agreement, the mortgage note and the mortgage were all executed on September 1, 1970, by Frol on behalf of Nuwestern. The regulatory agreement was incorporated by reference into the mortgage. All of the parties to the Commerce loan intended it to be a non-recourse loan. On September 25, 1970, when River Park was formed, Nuwestern received 8 of the River Park's partnership units in exchange for the property. Nuwestern transferred the property to River Park, and River Park assumed the liability to which the property was then subject, by dint of the following provisions of the Limited Partnership Agreement of River Park: 6. Contribution of General Partner.
The General Partner shall contribute to the partnership the land legally described on page 1 of this Agreement, but shall retain its legal title to that property, holding the same in trust for the exclusive benefit of this Limited Partnership and said property shall be transferred only pursuant to the business interests of, or for the benefit of, the Limited Partnership. That property shall be contributed subject to all presently outstanding encumbrances *328 which the Limited Partnership hereby assumes and agrees to pay according to their terms. * * *
14.Assumption of Encumbrances by Limited Partnership.
The limited Partnership, but not the Limited Partners individually, shall assume and become liable for any construction financing and permanent financing in order to build the apartments. Mortgage payments shall be met from the general funds of the partnership. The Limited Partnership Agreement of River Park was executed by Frol (both in his capacity as president of the general partner of River Park, Nuwestern, and in his individual capacity as a limited partner), Jordan, Brown, and Patrick R. Jeppeson. During the construction of the apartment complex, River Park experienced a cost overrun of approximately $200,000. The partnership sought and obtained financing from various sources to cover the cost of the overrun. In 1971, Brown, Frol and Jordan negotiated with Puget Sound National Bank (hereinafter Puget Sound) for the issuance to River Park of two letters of credit in favor of Commerce in the total amount of $50,477. The letters of credit were issued to Nuwestern, which was acting as an agent of River Park. *329 The letters of credit, or more specifically, any indebtedness that might arise upon a draft or drafts by Commerce against such letters of credit, were guaranteed by Frol, Brown, Jordan, and Patrick A. Jeppesen. Prior to December 2, 1972, Commerce executed drafts against these letters of credit for the full $50,477 amount. As a result of such drafts, on December 7, 1972, Nuwestern executed a recourse promissory note in favor of Puget Sound in that amount, which note was guaranteed by Frol, Brown, Jordan, and Patrick R. Jeppesen. In executing this note (hereinafter the Puget Sound Loan), Nuwestern was acting in its capacity as River Park's general partner. Crossroads, Inc. (hereinafter Crossroads) is a Washington corporation owned 20 percent each by Frol, Brown, Jordan, Patrick R. Jeppesen, and Leo Seiwerath. Frol was at all relevant times the president of Crossroads. River Park borrowed the following amounts on the following dates from Crossroads: Loan Amount
Loan Date
$15,000.00
11/2/72
22,176.65
12/14/72
1,725.00
9/12/73
These three loans will hereinafter be referred to in the aggregate as the Crossroads loans. On April 1, 1973, Nuwestern lent *330 $11,391.78 to River Park. This loan will be hereinafter referred to as the Nuwestern loan. The Crossroads loan of November 2, 1972, was drafted with Nuwestern as the nominal obligor. However, Nuwestern was merely acting in its capacity as River Park's general partner. All four of these loans were evidenced by non-interest-bearing demand promissory notes, all of which were personally guaranteed by Brown, Frol, and Jordan. River Park had the following items of income and deduction for its taxable years 1972 and 1973: Item
1972
1973
Net Rental Income (Loss)
($77,667.73)
($90,986.96)
Interest Income
94.53
Concession Income
449.53
726.42
NET PARTNERSHIP INCOME (LOSS)
($77,218.20)
($90,166.01)
Petitioners, as partners of River Park, deducted their distributive shares of such partnership losses on their Federal income tax returns for 1972 and 1973. [2] Since the deduction of a partner's distributive share of a partnership loss is limited to the amount of his adjusted basis in the partnership, petitioners were forced to calculate their respective bases in River Park. They calculated their bases on the assumption that the liabilities attributable *331 to the Commerce loan, the Puget Sound loan, the three Crossroads loans, and the Nuwestern loan provided them with sufficient bases in their partnership interests to absorb all of their respective distributive shares of River Park's losses for taxable years 1972 and 1973. Respondent disagrees with the petitioners' conclusions regarding the liabilities mentioned, and reduced their bases in their partnership interests accordingly. Since the petitioners' partnership bases, as reduced by respondent, cannot absorb all of the partnership losses deducted by the petitioners, respondent determined deficiencies in their Federal income taxes as set forth above. OPINION On December 29, 1969, Nuwestern, a Washington corporation owned equally by Brown, Frol, Jordan and Patrick R. Jeppesen, purchased some undeveloped real estate upon which an apartment complex was to be constructed. On September 1, 1970, Nuwestern obtained a construction loan from Commerce in the amount of $1,193,500, which loan was secured by the property previously acquired. Though the Commerce loan documents undeniably create a recourse liability, the parties to the loan, including the *332 FHA (which guaranteed the loan's payment), intended to create a non-recourse liability. On September 25, 1970, River Park, a Washington limited partnership, was formed by Nuwestern, who became River Park's sole general partner, and the four stockholders of Nuwestern, who became limited partners in the partnership. River Park is the investment entity which actually undertook the construction of the apartments. Nuwestern purchased 8 percent of the partnership's units (profits and losses were to be allocated in proportion to the number of partnership units owned by each partner) by transferring the property to the partnership, along with its accompanying liability, the Commerce loan. River Park specifically assumed payment of the Commerce loan upon its contribution to the partnership. Because of cost overruns experienced during the construction of the apartment complex, River Park sought additional financing. In 1971, it obtained letters of credit from Puget Sound in favor of Commerce. Drafts against these letters of credit resulted in the execution by Nuwestern on December 7, 1972, of a recourse promissory note in favor of Puget Sound in the amount of $50,447, which note was *333 guaranteed by Frol, Brown, Jordan, and Patrick R. Jeppesen. Crossroads, a Washington corporation owned equally by Frol, Brown, Jordan, Patrick R. Jeppesen, and Leo Seiwerath, lent the following amounts to the partnership on these dates: Loan Amount
Loan Date
$15,000.00
11/2/72
22,176.65
12/14/72
1,725.00
9/12/73
Nuwestern was the nominal obligor on the November 2, 1972, Crossroads loan, but River Park signed the notes evidencing the other two Crossroads loans. On April 1, 1973, Nuwestern lent $11,391.78 to River Park. The three Crossroads loans, as well as the Nuwestern loan, were personally guaranteed by Frol, Brown, and Jordan. All four loans were evidenced by non-interest-bearing, demand promissory notes. River Park had net losses of $77,218.20 and $90,166.01 in taxable years 1972 and 1973, respectively. The petitioners may deduct their distributive shares of these losses in their taxable years 1972 and 1973, respectively, only to the extent of their respective adjusted bases in River Park on December 31 of each of the two taxable years in question. Secs. 702, 704(d), and 706(a), I.R.C. 1954. [3] We must determine what effect, if any, the various *334 loans described above had on the adjusted partnership bases of the petitioners. Section 704(d), as in effect for the taxable years in issue, [4] limits the deduction of a partner's distributive share of the partnership's loss to the amount of the partner's adjusted basis in his partnership interest at the end of the partnership year in which such loss occurred. The general rules for determining a partner's basis in his partnership interest are found in sections 705, 722, and 742. In addition, section 752 provides special rules for determining a partner's basis where there is an increase or decrease in the partner's share of the partnership's liabilities. [5] As here relevant, section 752(a) provides that any increase in a partner's share of the liabilities of a partnership shall be considered as a contribution of money by such partner to the partnership. Since, under sections 705 and 722, contributions of money by a partner to a partnership result in a corresponding increase in that partner's basis in the partnership, the treatment prescribed by section 752(a) results in an increase in a partner's *335 basis to the extent of the increase in his share of the partnership's liabilities. *336 The question that arises is this: What constitutes "a partner's share of the liabilities of a partnership"? Though Congress has not addressed this issue directly, the Secretary of the Treasury has issued the following regulation which definitively answers this question: SEC. 1.752-1(e). Partner's share of partnership liabilities. A partner's share of partnership liabilities shall be determined in accordance with his ratio for sharing losses under the partnership agreement. In the case of a limited partnership, a limited partner's share of partnership liabilities shall not exceed the difference between his actual contribution credited to him by the partnership and the total contribution which he is obligated to make under the limited partnership agreement. However, where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), when all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share *337 the profits. * * * A leading commentator has provided an excellent explanation as to why non-recourse liabilities of limited partnerships are allocated according to profit-sharing ratios when all other liabilities are allocated according to the loss-sharing ratios of the partners: The sharing rules for recourse liabilities reflect the manner in which the partners will share responsibility for payment of the liability if it is not satisfied by the partnership. In effect, each partner is permitted to increase the basis of his partnership interest by the portion of the liability which he is contingently liable for if the partnership fails. The sharing rules with respect to nonrecourse liabilities necessarily are based on different considerations, since there is no possibility that the partners may be called upon to satisfy such liabilities. By allocating nonrecourse liabilities to all partners in accordance with their profit-sharing ratios, the Regulations recognize that the liability will be satisfied only out of profits or assets of the partnership and that no partner, regardless of his status as a general or limited partner, has any personal responsibility for the debt. * * *338 * [McKee, Nelson, and Whitmire, Federal Taxation of Partnerships and Partners, par. 8.01[1], p. 8-4 (1977); footnote omitted.] It is undisputed that we are dealing with liabilities incurred in the context of a limited, as opposed to a general, partnership. The controversy arises, with regard to the Commerce loan, because the parties disagree about whether such loan was a recourse or a non-recourse loan. Neither party attempts to characterize the Puget Sound loan, the three Crossroads loans, or the Nuwestern loan as non-recourse loans. However, the petitioners who guaranteed those loans believe that those loans provide them with basis increases, either because their guarantees constituted an obligation under the limited partnership agreement to make further contributions, or because the loans were actually made to those petitioners who, in turn, contributed the loan proceeds to the partnership, which contribution should entitle them to increases in their adjusted partnership bases under section 722.These are the main issues which we must now address. Commerce Loan
Respondent concedes on brief that the Commerce loan was a partnership liability on the relevant dates of *339 December 31, 1972, and December 31, 1973. However, he does not concede, nor do we find, that the Commerce loan was incurred as a partnership liability. Petitioners argue that Nuwestern (the obligor on the Commerce loan) was acting as River Park's agent when it incurred that liability. We disagree. A person can act as an agent of a partnership only when he has actual or apparent authority to do so. WASH. REV. CODE ANN. sec. 25.04.090. There can be no agent without a principal, and there can be no partner without a partnership. Nuwestern incurred the Commerce loan on September 1, 1970, more than three weeks before River Park was formed on September 25, 1970. Therefore, at the outset, the Commerce loan was a liability of Nuwestern, not in its capacity as a general partner, but in its own capacity. Though the Commerce loan was a Nuwestern liability at the outset, then Nuwestern transferred to River Park the property to which such liability was subject in exchange for the 8 partnership units which Nuwestern received upon the formation of River Park, the Commerce loan became a liability of the partnership. Sec. 752(c). Therefore, since September 25, 1970, the *340 Commerce loan has been a liability of the limited partnership, River Park. Next we must decide whether the Commerce loan was a recourse liability when initially incurred by Nuwestern. The relevant loan documents contain no language that would indicate that the liability was non-recourse. However, several factors convince us that such drafting evidences a scrivenor's error inasmuch as those factors lead us to a finding that all of the parties to the Commerce loan intended it to be, and thought that it was, a non-recourse liability. The only language in the loan documents that speaks to a limitation on Nuwestern's liability is found in paragraphs 1 and 17 of the FHA Regulatory Agreement for Multi-Family Housing Projects, which was incorporated into the mortgage. The wording of those provisions, though unambiguous, is confusing: 1. Owners [Nuwestern], except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage [the Commerce loan]. * * *
17. The following owners: NOTE
do not assume personal liability for payments due under the note and mortgage. * * * The word NONE in paragraph 17 is the only *341 word added by the parties to that paragraph, the remainder of the wording being form language. The double negative produced by using the word NONE in that paragraph produces the legal result that all the owners are personally liable. However, testimony by the parties to the loan convinces us that the insertion of the word NONE in paragraph 17 of the FHA's form regulatory agreement was done in an attempt to say that NONE of the owners assumed personal liability for payments due under the note and mortgage. Of course, petitioner Frol, the president of Nuwestern who negotiated the Commerce loan on Nuwestern's behalf, testified that he considered the Commerce loan to be a non-recourse liability. More importantly, Mr. Hugh Sherrick, who handled most of the loan transaction for the lender, Commerce, testified that his understanding was that the obligation of Nuwestern was limited to the property that was pledged as security for the loan. Moreover, Mr. Harold Barnes, the FHA's Director of Housing Management at the time the Commerce loan was made and a participant in the negotiations for such loan, testified that his understanding of the nature of the loan was that the obligor's *342 liability was limited to the assets which secured such liability. Under rigorous cross-examination, he testified that in his 24 years as an employee of the Department of Housing and Urban Development he had never known the FHA to seek a deficiency judgment after foreclosure on a property which had been assigned to them by a lender after default. In summary, we are absolutely convinced that all of the parties interested in the Commerce loan intended the liability incurred to be a non-recourse liability. Commerce, the drafter of the loan documents, simply failed to correctly express the intent of the parties when it inserted the word NONE into paragraph 17 of the regulatory agreement. Respondent objected to the introduction of evidence regarding the intent of the parties, his grounds being that such evidence violates the "parol evidence rule." The "parol evidence rule" states that "when two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedant understandings and negotiations will not be admitted for the purpose of varying *343 or contradicting the writing." 3 A. Corbin, Contracts sec. 573 (1960). This rule is not a rule of evidence, but is a rule of substantive contract law. It bears on the weight, if any, to be accorded evidence, not its admissibility.Moreover, oral testimony introduced to prove fraud, illegality, accident or mistake is always admissible. 3 A. Corbin, Contracts sec. 580 (1960). Such is the case here. The above-cited testimony was introduced to prove a mistake in the integration of the loan instruments. Such clearly relevant testimony is undoubtedly admissible. Fed. R. Civ. P. 401 and 402. If two parties are in clear agreement as to the factual and legal result that they wish to accomplish, and a document is drawn by a scrivenor using words that do not produce that result, the case is a proper one for reformation of the instrument. 3 A. Corbin, Contracts sec. 619 (1960). Silborn v. Pacific Brewing and Malting Co.,72 Wash. 13, 129 P. 581 (1913); Richards v. Pacific National Bank of Washington,10 Wash. App. 542, 519 P.2d 272 (Wash. App. 1974); Henderson v. Bobst,6 Wash. App. 975, 497 P.2d 957 (Wash. App. 1972); Geoghegan v. Dever,30 Wash. 2d 877, 194 P.2d 397 (1948). *344 We are to characterize legal interests, rights and relationships according to the law of the controlling state (here the State of Washington). Morgan v. Commissioner,309 U.S. 78 (1940); Helvering v. Stuart,317 U.S. 154 (1942); Collins v. Commissioner,412 F.2d 211 (10th Cir. 1969), revg. on rehearing 46 T.C. 461 (1966). [6] We are convinced that it has been clearly and convincingly shown that the parties intended to consummate a non-recourse loan. The courts of the State of Washington would rectify the error of the scrivenor, Commerce, and treat this loan as a non-recourse liability. We will do likewise. Thus, when Nuwestern borrowed funds from Commerce on September 1, 1970, the lender's only recourse upon the default of Nuwestern or its assignee was to foreclose the property. Having so decided, that decision does not end our inquiry. We must determine whether the Commerce loan *345 liability continued to be a non-recourse liability upon its transfer to River Park. We must conclude that it did not. River Park expressly assumed payment of the Commerce loan upon its transfer to the partnership by force of the following provisions in the limited partnership agreement: 6. Contribution of General Partner
The general Partner shall contribute to the partnership the land legally described on page 1 of this Agreement, but shall retain its legal title to that property, holding the same in trust for the exclusive benefit of this Limited Partnership and said property shall be transferred only pursuant to the business interests of, or for the benefit of, the Limited Partnership. That property shall be contributed subject to all presently outstanding encumbrances which the Limited partnership hereby assumes and agrees to pay according to their terms. 14. Assumption of Encumbrances By Limited Partnership.
The Limited Partnership, but not the Limited Partners individually, shall assume and become liable for any construction financing and permanent financing in order to build the apartments. Mortgage payments shall be met from the general funds of the partnership.
*346 The majority rule in the United States in that a grantee who assumes a liability for which his grantor was not personally liable has no personal liability. See 12 A.L.R. 1524. However, it is well-settled that Washington does not adhere to the general rule. Citing the theory that a mortgagee in such a situation is a third-party beneficiary to such as assumption, the Washington courts have steadfastly held that a remote grantee that assumes a mortgage is liable to the mortgagee, even though his immediate grantor was not personally liable on such debt. Corkrell v. Poe,100 Wash. 625, 171 P. 522 (1918); Citizens' Savings and Loan v. Chapman,173 Wash. 539, 24 P.2d 63 (Wash. 1933). Therefore, even though petitioners successfully convinced us that the Commerce loan was entered into as a non-recourse loan, the subsequent assumption of such liability by River Park renders the loan recourse as to the partnership. Under section 1.752-1(e), Income Tax Regs., a recourse liability of a limited partnership provides no increase in the adjusted bases of the limited partners of such partnership. Kingbay v. Commissioner,46 T.C. 147 (1966). *347 Since Nuwestern, as the sole general partner of River Park, is the only partner who is contingently liable on the Commerce loan, [7] none of the petitioners, as limited partners, may treat any portion of the Commerce loan as an increase in their share of the partnership's liabilities for purposes of section 752(a). Puget Sound, Crossroads, and Nuwestern Loans
We must first determine whether any or all of these loans [8] were partnership loans of River Park. Respondent appeared initially to contest whether the loans which designated Nuwestern as the principal obligor (the Puget Sound loan and the first Crossroads loan) were partnership loans. However, in his reply brief respondent concedes that all of the loans at issue were partnership loans. The resolution of this issue matters little. Since all of the loans imposed personal liability, Nuwestern was personally liable on all of the loans, whether by reason of being the principal obligor or by reason of being the sole general partner of River Park. [9] Furthermore, we believe and have found as a fact that Nuwestern signed all of the loans dealt with in this section *348 in its capacity as the sole general partner of River Park. Thus, all of these loans are personal liabilities of the partnership. As we have earlier discussed, limited partners generally receive no basis increase when a partnership incurs recourse liabilities. Sec. 1.752-1(e), Income Tax Regs.That being the case, petitioners' quest to utilize these liabilities to increase their adjusted partnership bases in River Park would be futile absent some countervailing considerations. Petitioners make two arguments which they hope will aid them in such quest. First, petitioners argue that the guarantees of the various loans by some of the petitioners constituted an obligation of those petitioners under the limited partnership agreement to make additional contributions to River Park. If the guarantees could be so characterized, then, under the provisions of section 1.752-1(e), Income Tax Regs., those petitioner-guarantors would be entitled to treat the excess of such contingent obligation over their actual contributions to the partnership as cash contributed to the partnership, *349 which treatment would provide them with the sought basis increases. However, the very words of the regulation they seek to utilize to their benefit preclude our acceptance of such a theory. The regulation requires that the additional obligation arise "under the limited partnership agreement." The limited partnership agreement of River Park specifically states that, "No Limited Partner has agreed to contribute any additional cash or property to this partnership." Should the petitioner-guarantors be forced to make good their guarantees of these loans, the payments would be made to the lenders, not to the partnership, and the payments would be made pursuant to the loan guarantees, not "under the limited partnership agreement." See Rev. Rul. 69-223, 1969-1 C.B. 184. Therefore, we reject this attempt by petitioners to use these loans to increase their adjusted partnership bases in River Park. Petitioners' other argument with regard to these loans is this: Since the guarantors negotiated these loans, and since the lenders in each instance were (according to the petitioners) looking solely to the guarantors for repayment of these loans, and since these loans would not have *350 been made without the attendant guarantees, the loans were, in reality, loans to the guarantors, who in turn contributed the proceeds of such loans to River Park, thus acquiring basis increases, under section 722, in the amount of such deemed contributions. Petitioners cite on cases in the partnership context which have adopted such a rationale, nor has our research revealed any such cases. Though petitioners cite some cases in the corporate area which they feel bolster this argument, [10] we do not find them to be analogous to the partnership area. Petitioners cite numerous cases that deal with the problem of distinguishing loans by partners or stockholders from capital contributions, but that is not the issue here. Here, third-party lenders lent money to River Park, and those loans were guaranteed by limited partners of the principal obligor. The fact that the limited partners helped negotiate the loans, and the fact that the loans might not have been made absent the guarantees, do nothing to distinguish this situation from a normal loan guarantee situation. In this context, the form of the transaction is its substance. The principal obligor is primarily liable; the guarantor *351 is secondarily liable. Petitioner-guarantors were only contingently liable on these loans. We reject the argument of the petitioners that these loans from Puget Sound, Crossroads, and Nuwestern were made to the partners who then contributed the loan proceeds to River Park. Having so said, we can summarize our findings with regard to the Puget Sound, Crossroads, and Nuwestern loans. They were liabilities of the partnership; such liabilities were with recourse; and, therefore, such liabilities could not function to increase the bases of petitioners in River Park. CONCLUSION
None of the liabilities here in issue--the Commerce loan, the Puget Sound loan, the three Crossroads loans, and the Nuwestern loan--were of such a nature that on December 31 of either 1972 or 1973 they were includable in the adjusted bases of petitioners. Due to concessions and computation adjustments, Decisions will be entered under Rule 155.
Footnotes
1. The following cases have been consolidated for trial, brief and opinion: Richard C. Brown and Joan C. Brown, docket No. 10262-76; Wesley N. Tefft and Alberta Y. Tefft, docket No. 10263-76; William W. Henshaw and Mary M. Henshaw, docket No. 10264-76; William H. Jordan and Wendy S. Jordan, docket No. 10265-76; Cyril M. Frol and Phyllis A. Frol, docket No. 10266-76; Einar Henriksen and Geraldine Henriksen, docket No. 10267-76; and Henry W. Anderson and Dorothy E. Anderson, docket No. 10268-76.↩
1. Though the parties stipulated that Jordan had a 25 percent profit and loss-sharing percentage, that was clearly not the case, according to the facts before us.↩
2. Sec. 706(a), I.R.C. 1954↩.
3. All section references are to the Internal Revenue Code of 1954, as amended.↩
4. [Sec. 704] (d) LIMITATION ON ALLOWANCE OF LOSSES. -- A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. ↩
5. SEC. 752. TREATMENT OF CERTAIN LIABILITIES. (a) INCREASE IN PARTNER'S LIABILITIES. -- Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership. (b) DECREASE IN PARTNER'S LIABILITIES. -- Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual libilities, shall be considered as a distribution of money to the partner by the partnership. (c) LIABILITY TO WHICH PROPERTY IS SUBJECT. -- For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property. (d) SALE OR EXCHANGE OF AN INTEREST. -- In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.↩
6. Collins v. Commissioner,46 T.C. 461 (1966), affd. 388 F.2d 353 (10th Cir. 1968), vacated and remanded 393 U.S. 215 (1968), revd. on rehearing 412 F.2d 211↩ (10th Cir. 1969).
7. Wash. Rev. Code Ann. secs. 25.04.150 and 25.08.070↩.
8. The Commerce loan is not dealt with in this portion of the opinion. ↩
9. See footnote 6, supra.↩
10. Blum v. Commissioner,59 T.C. 436 (1972); Santa Anita Consolidated Inc. v. Commissioner,50 T.C. 536↩ (1968).