957 P.2d 229 (1998)
Leslie A. LASHER, guardian for Jeffrey T. Lasher, her husband; and Leslie A. Lasher, a married woman, Appellant,
v.
UNIVERSITY OF WASHINGTON and
Dr. H. Leon Greene, M.D., Respondents.
No. 38451-1-I.
Court of Appeals of Washington, Division 1.
March 23, 1998.
Publication Ordered May 22, 1998.
*230 Robert E. Bodkin, Kirkland, for Appellant.
Philip John Vanderhoef, Fain Sheldon et al, Mary H. Spillane, Williams, Kastner & Gibbs, Seattle, for Respondents.
AGID, Judge.
Leslie A. Lasher as guardian for her husband, Jeffrey T. Lasher, appeals from the judgment entered on the jury's verdict in this medical malpractice case against the University of Washington and H. Leon Greene, M.D. She argues that the trial court erred in admitting evidence about Dr. Greene's "habit" of warning patients with heart conditions like Jeffrey Lasher's about certain kinds of activity. Because that testimony concerned an issue central to this case and should have been excluded under RCW 5.60.030, the deadman's statute, we reverse.

FACTS
In 1986, Jeffrey Lasher, who was then 21 and living in Colorado, was diagnosed with a rare heart disease known as arrythmogenic right ventricular dysplasia, which can cause the heart to beat irregularly and may be fatal. Lasher, who had passed out several times while playing basketball, was also diagnosed with exercise-induced ventricular tachycardia, the abnormal racing of the heart which, if it is not controlled or interrupted, can cause ventricular fibrillation and cardiac arrest. Dr. David Mann, a cardiologist at the University of Colorado, prescribed a maintenance dose of 400 mg. daily of amiodarone in order to control Lasher's arrhythmia and ventricular tachycardia. So long as Lasher maintained his maintenance dosage of amiodarone, Dr. Mann did not limit his activities, which included heavy construction and recreational basketball.
In 1987, Lasher and his family moved to the Puget Sound area. Lasher first saw Dr. H. Leon Greene, a cardiologist at Harborview Medical Center and a professor of medicine at the University of Washington Medical School, in August 1988. In February 1989, after Lasher had been his patient for several months, Dr. Greene began to gradually reduce his amiodarone dose. By June 1989, the dosage had been reduced to 400 mg. every three days, approximately one third of its prior level. On May 11, 1991, Lasher collapsed while playing half-court basketball with his younger brother. He was taken to Everett General Hospital where he was diagnosed with cardiac arrest. Lasher sustained severe brain damage and was left seriously mentally impaired.
Lasher[1] filed this action against Dr. Greene and his employer, the University of Washington. He alleged that Dr. Greene failed to manage his amiodarone levels at therapeutic levels which would have prevented the recurrence of an episode of ventricular tachycardia like the one that led to his cardiac arrest on May 11. Lasher also alleged Dr. Greene had failed to adequately inform him about either the risk of strenuous activities such as recreational basketball or the benefits of implanting a cardiac defibrillator device.
Prior to trial, Lasher moved to exclude testimony by Dr. Greene about the content of conversations he had had with Jeff Lasher under the deadman's statute. Lasher also moved to exclude Dr. Greene's testimony that he had a practice of warning some heart patients about the risk of engaging in strenuous activities on the ground that it did not rise to the level of "habit" within the meaning of ER 406. The trial court ruled that, so long as Lasher did not waive it in the course of trial, the deadman's statute barred Dr. Greene's testimony about information provided to Jeff Lasher during their consultations. But the trial court also ruled that, if *231 Dr. Greene were able to establish the necessary foundation, he would allow evidence of "habit" under ER 406. Before trial began, the court cautioned the jury as follows:[2]
Under Washington law, because Mr. Lasher is legally incompetent, neither Mr. Lasher nor Dr. Greene may currently testify about the conversations between Mr. Lasher and Dr. Greene during the course of Mr. Lasher's treatment by Dr. Greene.
At the conclusion of trial, the jury returned a verdict for the defendants.

DISCUSSION
Lasher first contends that the trial court erred in admitting Dr. Greene's testimony about his "habit" of warning patients with certain heart conditions about the risks of some kinds of physical activity because it contravenes RCW 5.60.030, the deadman's statute. RCW 5.60.030 provides in pertinent part:
[I]n an action or proceeding where the adverse party sues or defends ... as the guardian or limited guardian of the estate or person of any incompetent or disabled person ... then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such ... incompetent or disabled person[.]
The purpose of this statute is to prevent interested parties from giving self-serving testimony about conversations or transactions with a dead or incompetent person.[3] The deadman's statute does not bar testimony which relates solely to the acts of the witness and not to a transaction with the incompetent person.[4] But "an adversely interested party cannot testify indirectly to that to which he is prohibited from testifying [about] directly, and thereby create an inference as to what did or did not transpire between himself and the deceased person."[5] Here, the only reason for Dr. Greene's testimony that he has a "habit" of warning certain patients about the risk of strenuous exercise was to support an inference that he gave Jeff Lasher such a warning. Its purpose, in other words, was to accomplish by indirect testimony what Dr. Greene could not testify to directly because of the bar in the deadman's statute.[6] For that reason, Dr. Greene's testimony should have been excluded under RCW 5.60.030.
Dr. Greene argues that it is unfair to allow Lasher to claim that he did not receive adequate warnings when Dr. Greene cannot refute *232 that claim by testifying to the content of his conversations with his patient.[7] But that argument ignores that Jeff Lasher also cannot testify about whether he was or was not given such warnings. Given his current condition and the operation of the deadman's statute, both parties now have no choice but to rely on the medical records Dr. Greene prepared. The problem is that, notwithstanding Dr. Greene's testimony that he does sometimes note warnings he gives patients about the risk of strenuous exercise in their charts, he made no note in Jeff Lasher's chart that he had given him such a warning.
Dr. Greene's argument that his testimony is admissible because it is on a par with medical records, which courts ave held are not barred by the deadman's statute because they are not self-serving, ignores the courts' reasoning in those cases. Medical records have been held to constitute an exception to the bar established by the deadman's statute because the "objective nature of such records made prior to any motive for fabrication [protects] against self-serving statements."[8] Dr. Greene's trial testimony, in contrast, did not occur until after a motive for fabrication arose. The very purpose of the deadman's statute is to avoid the inequity of allowing self-serving testimony by the surviving party to a transaction while the lips of the other party are sealed by death or incompetency.[9]
Reversed.
BAKER, C.J., and KENNEDY, J., concur.
NOTES
[1] Prior to trial, the trial court ruled that Jeff Lasher was incompetent and appointed his wife, Leslie Lasher, as his guardian.
[2] The court's cautionary instruction was not a comment on the evidence, because it did not "`... convey or indicate to the jury a personal opinion or view of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial.'" See City of Kirkland v. O'Connor, 40 Wash.App. 521, 523, 698 P.2d 1128 (1985) (quoting State v. Owen, 24 Wash.App. 130, 134, 600 P.2d 625 (1979)). Rather, it was reasonably intended to "avoid confusion and unfair speculation by jurors regarding the reasons that Mr. Lasher and Dr. Greene are not expected to testify at trial" about the content of conversations they had and was an accurate statement of the law. See Christensen v. Munsen, 123 Wash.2d 234, 249, 867 P.2d 626, 30 A.L.R.5th 822 (1994). In contrast to the improper comment on the absence of any evidence of the defendant's blood alcohol level in O'Connor, the instruction here simply clarified for the jury that it would not hear any testimony by either side about the content of their conversations and that it should not draw any inference one way or the other from that.
[3] Wildman v. Taylor, 46 Wash.App. 546, 549, 731 P.2d 541 (1987).
[4] Richards v. Pacific Nat'l Bank of Washington, 10 Wash.App. 542, 548, 519 P.2d 272, review denied, 83 Wash.2d 1014 (1974).
[5] Martin v. Shaen, 26 Wash.2d 346, 353, 173 P.2d 968 (1946).
[6] See Bentzen v. Demmons, 68 Wash.App. 339, 345-46, 842 P.2d 1015 (1993) (even though the adverse interested witness did not testify about the specific transaction, his negative testimony constituted a waiver of the deadman's statute because it went to the matters directly at issue in that case); Thor v. McDearmid, 63 Wash.App. 193, 201, 817 P.2d 1380 (1991) (party prohibited from testifying to her own conduct because the testimony related, in substance, to transactions between her and her deceased parents); Lappin v. Lucurell, 13 Wash.App. 277, 291, 534 P.2d 1038, 94 A.L.R.3d 594, review denied, 85 Wash.2d 1018 (1975) (trial court erred in admitting testimony regarding subjective impressions of transaction with decedent because that allowed decedent's niece and her husband to testify indirectly to what they could not testify directly).
[7] We sympathize with Dr. Greene's argument, especially in the context of an informed consent claim where the entire focus of the cause of action is on conversations between physician and patient. But, as the Washington Supreme Court explained in Erickson v. Kerr, 125 Wash.2d 183, 189, 883 P.2d 313 (1994), any argument that application of the deadman's statute is unfair is better brought before the Legislature. And, as the trial court noted, if the Legislature had wanted to create an exception to application to the deadman's statute in informed consent cases, it could have done so in 1977 when it enacted the informed consent statute, RCW 7.70.050.
[8] Erickson, 125 Wash.2d at 188, 883 P.2d 313.
[9] Erickson, 125 Wash.2d at 187, 883 P.2d 313. See also 5A K. Tegland, Wash. Prac., Evidence § 212, at 133 (3d ed.1989) (the deadman's statute is intended to avoid the inequity that would result if a trier of fact were "to reach a decision about the transaction based only upon one side of the story").